**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

98 OCT -2  PM 3: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

SALLY FREDERICK, )
)
    Plaintiff )
)
    vs. )
)
BENEFIT ADMINISTRATORS, INC. )
and SKYLINE TRANSPORTATION, )
INC., )
)
    Defendants )

CIVIL ACTION NO.

CV-97-AR-2763-M

**ENTERED**

OCT - 2 1998

## MEMORANDUM OPINION

Presently before the court is a motion for summary judgment filed by defendants. Sally Frederick brought the above captioned-action against Benefit Administrators, Inc. ("Benefit Administrators") and Skyline Transportation, Inc. ("Skyline"). She makes, or attempts to make, three federal claims against defendants, namely, a violation of the Americans with Disabilities Act ("ADA"), a violation of the Equal Protection Clause of the Fourteenth Amendment, and a violation of the Employment Retirement Income Security Act ("ERISA"). As pendent state claims, plaintiff alleges intentional, negligent infliction of emotional distress, and bad faith denial. Defendants' Rule 56 motion challenges all of plaintiffs theories and counts. This court finds that defendants' Rule 56 motion is due to be granted in its entirety because there is no genuine issue of material fact.

27

## Putative Undisputed Facts

Sally Frederick is an achondroplastic dwarf.[1]   She stands just over four feet tall, and at the time of the events in question, weighed approximately 140 pounds.  Despite her small stature, she can drive,[2] and, according to her own deposition testimony, has no difficulty working around the house, speaking, breathing, seeing, hearing, or learning. Plaintiff also walks without difficulty, but has some trouble walking for long periods of time.  Prior to the institution of this action, plaintiff has held a number of different jobs, including jobs with the Redstone Arsenal, a sewing plant, a phone company, a gas company, and the United Garment Workers' Association, where she was the business agent and the recording secretary for the local post of the union.  Plaintiff currently works from her home, taking orders for Amway products.

Plaintiff is married to Troy Frederick ("Mr. Frederick"), an employee of Skyline.  Skyline makes available to its employees and their dependents a self-funded health benefits plan ("the Plan").  The Plan is underwritten by International Assurance of Tennessee, Inc. ("International Assurance").  The Plan is administered and managed by Benefit Administrators.  Benefit Administrators, in turn, is managed by Wanda Vanstory ("Vanstory").   Vanstory has the apparent authority to determine the eligibility of applicants without consulting the

---

[1] Achondroplatic dwarfism is the most common type of dwarfism and is caused by an inherited defect of the bones.  Characteristics include normal sized trunk with short limbs, a large head with sunken nose and small face, stubby hands and a sway back.

[2] In her deposition, plaintiff states that her car must be altered because of her height, but goes on to say that she can drive.

2

underwriter.[3]

Each Skyline employee receives an Employee Health Benefits booklet ("the booklet") describing, in general terms, the provisions of the Plan.[4] The booklet informs its reader that applicants for coverage may be required to provide "evidence of good health, at the expense of the employee, satisfactory to the Company."[5]   Once an applicant becomes eligible for coverage, the terms of the Plan provide a Lifetime Plan Maximum of $1,000,000, subject to several exceptions.   One exception significant in this case places a $2500 lifetime maximum on any preexisting condition.  The booklet defines preexisting conditions as any condition for which a covered individual received treatment, consultation, or advice at any time during a twelve month period immediately preceding the individual obtaining coverage under the Plan.

On January 25, 1995, plaintiff's husband applied for dependent insurance coverage for plaintiff.   On the application for insurance, plaintiff noted her height as 4 feet, 1 inch and her weight as 125 pounds.   Plaintiff also noted that a benign cyst had been removed from her breast.  Benefit Administrators denied plaintiff dependent coverage, identifying as the basis for that denial plaintiff's past medical problems with recurring breast cysts.

On June 10, 1996, Mr. Frederick again applied for dependent

---

[3] Vanstory depositin, p. 18.

[4] On page 2, the booklet informs its reader:
> In the interest of simplicity the coverage described has been described in rather general terms in this booklet.  The extent of your coverage at all times is governed by the complete terms of the Plan Document.

[5] Booklet, pg. 7.

insurance coverage for plaintiff. Plaintiff states that she did not fill in the height and weight information because she thought Benefit Administrators had that information from her previous application.[6] At some point, however, the application came to describe plaintiff's height as 4 feet, 1 inch and her weight as 210 pounds.[7] By letter dated June 19, 1996, Benefit Administrators again denied dependent coverage, this time stating "[a]ll applications require an evidence of insurability form which indicates medical conditions and height and weight information . . . . the information furnished does not meet the guidelines required by the underwriters."[8]

In a letter dated July 30, 1996 plaintiff (through an attorney) expressed concern that Benefit Administrators' "determination that lack of height denies one's insurability is an inappropriate criteria [sic]"[9] The same letter requested further information from Vanstory regarding the basis for the denial. Vanstory supplied this information via letter of August 22, 1996, indicating that she received information that plaintiff's height as "4'1" and weight . . . 210 lbs. . . anything over

---

[6] Plaintiff was apparently unconcerned that her reported weight of 125 pounds on her first application did not accurately described her weight at the time of her second application.

[7] Plaintiff's pleadings seem to suggest that the appearance of the height and weight information is the result of some type of foul play on the part of one or both of the defendants. In deposition, however, plaintiff testified repeatedly that she had no idea how that information appeared on the application. See Plaintiff depos. pp. 57-59. Plaintiff concedes the possibility that her husband may have filled in the information. Indeed, the penmanship of the author of those numbers does appear strikingly similar to Mr. Frederick's own script.

[8] Letter Vanstory to Mr. Frederick, Plaintiff's Exhib. F.

[9] Letter from Donald Rhea to Vanstory, Plaintiff's Exhib. J.

4

150 overweight debit is an automatic decline."[10]  Vanstory's letter also referred plaintiff and her attorney to the appeals process and indicated what action and information would be necessary to start the appeals process.

Upon learning of the height and weight information reported to Benefit Administrators, plaintiff telephoned Vanstory to explain the error.  This phone call represents the first time plaintiff herself communicated with Vanstory.  The call also marks the beginning of plaintiff's not insignificant efforts to prove her insurability. Attempting to correct the erroneous information,  plaintiff had her height and weight certified as 4 foot, 1 inch and 141 pounds, respectively, and faxed this information to Vanstory on September 10, 1996.

Vanstory then requested that plaintiff obtain a mammogram and send the results to Benefit Administrators.  On September 11, plaintiff complied with this request.  Vanstory then asked plaintiff to undergo a physical examination of her breast, which she did on September 12, 1996. The notes of Dr. John Smith ("Dr. Smith") detail this examination,[11] but provide no information about the condition of plaintiff's breast.  The notes do contain, however, plaintiff's recent medical history, including reference to her past prescriptions for Prozac and Triavil, and the notation  that she "gets nervous easily."  Notes from September 12 also identified high blood pressure as plaintiff's chief complaint.  The notes

---

[10] Letter from Vanstory to Donald Rhea, Plaintiff's Exhib. J.

[11] Notes of Dr. Smith, Plaintiff's Exhib. J.

5

go on to prescribe blood pressure medication.[12]

On October 2, plaintiff had another appointment with Dr. Smith. [13] The notes from this examination contain references to plaintiff's scars from her previous breast surgery, and her lingering depression ("there is a little trace of it left"). These notes indicate that plaintiff is "still on Triavil" for her depression. With regard to plaintiff's blood pressure, the October 2 notes indicate that a blood pressure measurement was taken twice on September 23 and once during the October 2 visit. The notes contain a reference to blood pressure medication similar to the reference made on September 12. In a October 2 memorandum addressed simply to "Insurance," Dr. Smith explicitly states "[Plaintiff's] blood pressure was normal today 128/82, on Ziac 2.5mg." The memorandum also notes that a breast exam was normal except for scars from previous surgery and further informs the reader that plaintiff is an achondroplastic dwarf.

An additional communication from Dr. Smith to Benefit Administrators, signed and dated October 9, 1996, summarized plaintiff's visits of September 12 and October 2, again stating high blood pressure as a "complaint" and noting blood pressure medication as "treatment." The October 9 communication notes plaintiff's past breast cyst and contains references to "panic attacks" and plaintiff's status as an achondroplastic dwarf. No information is provided in response to Benefit Administrators' request to "advise how long [plaintiff] has been on

---

[12] Specifically, Dr. Smith's notes of September 12 state in reference to plaintiff's blood pressure "P: Ziac 2.5 mg 1 PO daily. stop smoking. recheck Monday or Tues."

[13] Plaintiff presented no evidence that Vanstory requested a follow-up consultation.

6

Hypertension medication."

Benefit Administrators received plaintiff's medical information and considered her eligibility. As evidenced by the facsimile communication dated October 14, Vanstory sought the input of International Assurance.[14] While International Assurance's communication in response indicates that "it is not the responsibility of International Assurance. . . to determine eligibility,"[15] an employee from International Assurance apparently reviewed plaintiff's file. A faxed communication of October 16, purportedly addressed to plaintiff, notes plaintiff's high blood pressure and states that "achondroplastic dwarfism is a decline" and that "depression - currently or 0-7 years since recovery" is also grounds to deny coverage.[16] Another communication from International Assurance however, noted that plaintiff was <u>not</u> on high blood pressure medication and characterized plaintiff's depression as "mild, looking at the meds she's on."[17] This communication concluded by stating it was "OK from Vikki to put on plan."

Via letter dated October 18, 1996, Vanstory informed Mr. Frederick that dependent coverage had been approved and would become effective on November 1. The letter informed Mr. Frederick that during the first year of eligibility, the terms of the Plan precluded benefits payments for charges connected with plaintiff's preexisting conditions. After the

---

[14] The communication from Vanstory states "Please review for medical plan. Troy Frederick - covered; applying for spouse." Fax from Vanstory, Plaintiff's Exhib. J.

[15] Fax 1 from International Assurance, Plaintiff's Exhib. J.

[16] Fax 2 from International Assurance, Plaintiff's Exhib. J.

[17] Fax 2 from International Assurance, Plaintiff's Exhib. J.

first year, the letter informed Mr. Frederick that a lifetime maximum of $2500 existed for all preexisting conditions. The letter named plaintiff's high blood pressure and nervous disorder as preexisting conditions.

Based on the foregoing facts, plaintiff alleges violations of federal law and state law.

### Discussion

As a preliminary matter, this court notes that the answer of defendant Benefit Administrators contains as a Ninth Affirmative Defense the contention that Benefit Administrators is not subject to *in personam* jurisdiction in Alabama. This conclusory statement is not sufficient to convince this court that it is without jurisdiction as to that defendant. Furthermore, it affirmatively appears that defendant's relations with the state of Alabama easily satisfy a minimum contacts analysis.

### Count I: The ADA Claim

Plaintiff's complaint avers that the "defendant [singular] has discriminated against [her] solely on the basis of her disability by denying her the full and equal services, goods, and accommodations otherwise available to members of the general public." Plaintiff claims that this discrimination violates Title III of the ADA. Title III generally prohibits discrimination against disabled individuals in connection with the provision of "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases. . . or operates a place of public accommodation." 42 U.S.C. § 12182 (1995).

8

This claim presents an interesting legal issue of first impression in this jurisdiction, to wit: whether Title III applies to discrimination in the terms of an insurance policy or whether it is limited to discrimination in the physical access to goods and services.

Very few circuits have addressed this issue. The Third and Sixth Circuits agree that Title III does not permit a claim for discrimination based on denial of insurance benefits. See generally Ford v. Shering-Plough Corp., 145 F.3d 601 (3rd Cir. 1998); Lenox v. Healthwise of Kentucky, Ltd., 1998 WL 374754 (6th Cir.); Parker v. Metropolitan Life Insurance Co., 121 F.3d 1006 (6th Cir. 1997).[18] The First Circuit, however, recognizes a possibility that such a claim could be viable under Title III, but did not definitively rule on the issue. See Carparts Distrib. Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d 12 (1st Cir. 1994).

While this court is inclined to agree with the reasoning of the Sixth Circuit in Parker, this court concludes that it need not decide whether such a claim is actionable under Title III since plaintiff's ADA claim must fail for other reasons. This court therefore assumes, without deciding, that Title III of the ADA addresses the conduct of which plaintiff complains.

Having granted plaintiff the assumption that, in theory, a plaintiff can bring a similar claim under Title III, this court concludes that this plaintiff cannot bring a claim under Title III of the ADA. In order to

---

[18] In her response to defendant's motion for summary judgment, plaintiff relies on an earlier decision of the Sixth Circuit in Parker v. Metropolitan Life Insurance Co., 99 F.3d 181 (6th Cir. 1996). This court notes that the decision relied upon by plaintiff has been overruled. See Parker, 121 F.3d 1006 (6th Cir. 1997).

bring a claim under the ADA, plaintiff must demonstrate that she is an individual with a disability.  The ADA defines disability as (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12101(2) (1995).  Plaintiff points out that the legislative history of the ADA states that the terms "physical or mental impairment" include, *inter alia,* any "physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting . . . the neurological, [or] musculoskeletal . . . [system]."  H.R. REP. No. 101-485 (1990).  Plaintiff contends, and this court is persuaded, that her dwarfism qualifies as a physical impairment.

Convincing the court that she suffers from a physical impairment, however, is not the end of plaintiff's task.  She must also convince the court that her physical impairment substantially limits one of her major life activities.  By plaintiff's own deposition testimony, she can drive, see, speak, hear, walk, learn, breathe, work around the house, and hold a regular job.  In short, plaintiff's dwarfism appears to have little to no effect on her ordinary activities.  She is therefore not an individual with a "disability" and cannot maintain an action under the ADA.

Even assuming (1) that Title III prohibits discrimination in the *contents* of an insurance policy and not just the ability of a disabled individual to access an insurance office; and (2) that plaintiff's dwarfism substantially limits one of her major life activities, plaintiff's claim of disability discrimination nevertheless fails because she cannot show that defendants denied her insurance coverage or failed

10

to provide her with coverage different from the coverage offered applicants who do not suffer from a "disability." Taking plaintiff's ADA argument in the most favorable light possible, this court assumes that plaintiff complains that defendants violated the ADA by considering her disability in initially denying her coverage on June 19 and that defendants violated the ADA by continuing to consider her disability when reevaluating her application.[19] It is, or should be, well understood that underwriters consider many physical and mental characteristics when evaluating insurance applicants.

As the basis for denial of eligibility, the June 19 letter indicates that plaintiff's medical conditions and height and weight fall outside the guidelines required by the Plan's underwriters. At that point in time, plaintiff's two applications listing her height as four feet, one inch constituted the only information defendants had about plaintiff's height. While it is possible that Benefit Administrators deduced plaintiff's status as dwarf from the height listed on her application, plaintiff has not presented one scintilla of evidence to suggest that defendants did, in fact, assume that plaintiff was a dwarf. In fact, the *only* evidence plaintiff presented as to the reason for initial denial suggests that plaintiff was denied because of her listed weight and her past history of breast disorder.[20] Neither of these reasons relate in any

---

[19] Plaintiff expressly complains only of the denial of coverage on June 19, however, an allegation that defendants violated the ADA by continuing to consider plaintiff's disability is implicit throughout her complaint and is consistent with the position taken in her brief in opposition to defendants' motion.

[20] Vanstory's August 22 letter to plaintiff's attorney discloses that the information Benefit Administrators had at that time listed plaintiff's height as four feet, one inch and her weight as 210 pounds. Vanstory states "anything over 150 overweight debit is an automatic decline." This statement

way to plaintiff's claimed "disability."

In support of her claim that defendants impermissibly considered her alleged disability when reevaluating her application for insurance, plaintiff points to the information provided Benefit Administrators by Dr. Smith identifying plaintiff as an achondroplastic dwarf. Plaintiff also points to the statement made by an employee of International Assurance that the "manual says achondroplastic dwarf is a decline." The combination of these two facts would constitute direct evidence of discrimination if plaintiff, had in fact, been denied coverage or been given coverage that differs from other, non-disabled applicants. In this case, however, plaintiff was found to be eligible for coverage. Any difference between the coverage afforded by her policy and that afforded by the "standard" policy does not in any way relate to her disability, but rather to her preexisting conditions. Thus, even plaintiff's "smoking gun" cannot carry the day.

Assuming that Title III of the ADA can be relied upon to protect individuals from discrimination in the contents of insurance policies, plaintiff is not an individual with a disability, as that term is statutorily defined. She therefore cannot bring a claim under the ADA. Even assuming plaintiff's dwarfism does qualify as a disability, plaintiff's ADA claim is without merit. Having considered all facts in plaintiff's favor, this court concludes that defendant is entitled to judgment as a matter of law as to Count I of plaintiff's complaint.

---

suggests that Benefit Administrators was primarily concerned about plaintiff's weight, not height.

**Count II: The Equal Protection Claim**

Plaintiff's complaint alleges a violation of the Equal Protection Clause of the Fourteenth Amendment. It is well settled that there can be no violation of the Fourteenth Amendment without "state action." Both Skyline and Benefits Administrators are private entities. Plaintiff has set forth no theory, such as state entanglement, state encouragement, or private performance of a public function, on which this court could find state action. Furthermore, the Equal Protection Clause was not designed to protect persons with a disability from disparate treatment. Defendants' motion for summary judgment is therefore due to be granted with regard to the Equal Protection Claim.

**Count III: The ERISA Claim**

As to plaintiff's ERISA claim, this court initially notes that plaintiff failed to exhaust her administrative remedies as required in this jurisdiction. See Counts v. American General Life & Accident Ins. Co., 111 F.3d 105, 109 (11th Cir. 1997); Springer v. Wal-Mart Associates' Group Health Plan, 908 F.2d 897, 899 (11th Cir. 1990). While district courts have discretion to excuse the exhaustion requirement when resort to administrative remedies would be futile or the remedy inadequate, no reason is presented that would excuse plaintiff's failure to exhaust in this case. See Counts, 111 F.3d at 109. Because plaintiff's ERISA claim must fail on other grounds, for the purposes of this motion, this court will go beyond plaintiff's failure to exhaust the appeals process outlined by the Plan.

Plaintiff alleges that defendants violated ERISA "by denying access to health insurance coverage based on erroneous information on the

13

application and also for not immediately insuring [p]laintiff when the error was corrected." This court has gone to great lengths to discern which, if any, provision of ERISA this conduct might offend. Plaintiff's brief in response to the motion for summary judgment suggests that plaintiff is proceeding on the theory that defendants have breached a fiduciary duty which they owed to her. In particular, the brief discusses the possibility that Vanstory acted arbitrarily and capriciously in making eligibility determinations. Whether a fiduciary acts in an arbitrary or capricious manner is relevant only to determining whether there has been a breach of fiduciary duty. Plaintiff's brief also highlights the fact that Vanstory is married to one of Skyline's vice presidents and states "this presents a conflict of interest issue." The existence of a conflict of interest in a Plan fiduciary is relevant only to the assessment of whether that fiduciary acted arbitrarily or capriciously. Based on these statements in plaintiff's brief, this court assumes that plaintiff's ERISA claim is based on ERISA Section 409(a), which provides:

> Any person who is a fiduciary with respect to a plan
> who breaches any of the responsibilities, obligations,
> or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan
> any losses to the plan resulting from each such breach,
> and to restore to such plan any profits of such
> fiduciary which have been made through use of assets
> of the plan by the fiduciary, and shall be subject
> to such other equitable or remedial relief as the
> court may deem appropriate, including removal of
> such fiduciary . . .

29 U.S.C. § 1109 (1985 and Supp. I 1998).

Having thus identified the only theory on which plaintiff's ERISA claim could be based, this court is compelled to doubly grant defendants'

14

summary judgment motion in light of <u>Massachusetts Mutual Life Insurance</u>
<u>Company v. Russell</u>, 473 U.S. 134, 105 S.Ct. 3085 (1985).  In <u>Russell</u>, a
beneficiary of an employee benefits plan brought an action against the
plan fiduciaries, alleging that they breached a duty owed the beneficiary
by (1) ignoring readily available medical evidence documenting the
beneficiary's claim; (2) applying unwarrantedly strict eligibility
standards; and (3) exceeding the time period prescribed by regulation for
processing claims.  <u>Id.</u> at 136, 105 S.Ct. 3087.  The Supreme Court of the
United States read ERISA Section 409 in conjunction with ERISA Section
502(a) and concluded that Section 502(a) authorizes a beneficiary to
bring an action against a fiduciary who violates Section 409.  <u>Id.</u> at
140, 105 S.Ct. at 3089; <u>see</u> 29 U.S.C.  §§ 1109, 1132(a) (1985 & Supp. I
(1998)).  The Court went on to explain, however, that the primary purpose
of Section 409 is to prevent the misuse of plan assets and the remedies
that would protect the entire plan, not protection of the rights of the
plan's individual beneficiaries.  <u>Russell</u>, 473 at 142; 105 S.Ct. at 3090.
Continuing its explanation, the Court concluded that:

> the relevant text of ERISA, the structure of the
> entire statute, and its legislative history all
> support the conclusion that in Section 409 Congress
> did not provide, and did not intend the judiciary
> to imply, a cause of action for extra-contractual
> damages caused by improper or untimely processing
> of benefit claims.

<u>Id.</u> at 148; 105 S.Ct. at 3093.

This court is not particularly fond of <u>Russell</u> but finds it
controlling.  Plaintiff cannot maintain a claim for extra-contractual
damages resulting from an alleged breach of fiduciary duty.  Because
plaintiff has incurred no additional medical expenses since obtaining

15

coverage and has submitted no claims for benefits, there are no contractual damages to which she is entitled. Although plaintiff did incur expenses in proving her insurability, the terms of the Plan clearly indicated that applicants for coverage could be required to provide evidence of good health at their own expense. Because plaintiff has no claim for contractual damages under the Plan and claims for extra-contractual damages are unavailable to plaintiffs alleging a breach of fiduciary duty, defendants' motion for summary judgment with respect to the ERISA claim would be due to be granted even if plaintiff had pursued to conclusion the internal procedures available to her. The truth is that plaintiff's ERISA claim should not survive a Rule 12(b)(6) motion, much less a Rule 56 motion.

## Counts IV and V: Intentional and Negligent Infliction of Emotional Distress

In addition to her federal law claims, plaintiff contends that defendants' conduct amounts to an intentional infliction of emotional distress. In Alabama, this cause of action is also known as the tort of outrage. In order to recover for the tort of outrage, plaintiff must show (1) that the defendants intended to inflict emotional distress or that they knew or should have known that emotional distress was likely result from their conduct; (2) that the defendants' conduct was extreme and outrageous; (3) that defendants' actions caused the plaintiff distress; (4) that the distress caused was severe. Shepherd v. Summit Management Co., Inc., 1998 WL 381869 (Ala.Civ.App.); see Harris v. McDavid, 553 So.2d 567, 570 (1989). The Supreme Court of Alabama has explained that the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to

16

be regarded as atrocious and utterly intolerable in a civilized society."
<u>Harris</u>, 553 So.2d at 570. This court finds that plaintiff has not even
come close to satisfying this very high burden.

Plaintiff also alleges a negligent infliction of emotional distress.
The Supreme Court of Alabama has long held that an independent tort for
negligently inflicted emotional distress does not exist. <u>AALAR, Ltd.
v. Francis</u>, 1998 WL 178787, *3; <u>see, e.g., Reserve National Ins. Co. v.
Crowell,</u> 614 So.2d 1005 (Ala. 1993), <em>cert denied,</em> 510 U.S. 824, 114 S.Ct.
84; <u>Allen v. Walker</u>, 569 So.2d 350 (Ala. 1990). Instead, Alabama
recognizes negligently caused emotional distress only as part and parcel
of the traditional tort of negligence. <u>AALAR</u>, 1998 WL 178787, *3. In
the traditional negligence context, emotional distress is compensable
only in connection with a defendant's breach of some duty imposed by law.
<u>Id.</u> As set forth in the preceding sections, taking all facts and
inferences in favor or the plaintiff, defendants have not violated the
ADA, the Equal Protection Clause, or ERISA. As the following section
will set out, plaintiff's claim that defendants' conduct constitutes "the
tort of bad faith" is similarly without merit. Because defendants'
conduct breaches no duty imposed by law, plaintiff cannot recover for
emotional distress. <u>See id.</u>

## Count VI: Bad Faith

Plaintiff's sixth and final count avers that defendants' conduct
amounts to "the actionable tort of bad faith." Plaintiff complains that
"the defendant acted in bad faith in denying her insurance coverage based
upon knowingly incorrect height and weight information where there was
no lawful basis for the refusal coupled with the actual knowledge of that

17

fact and/or intentionally failed to determine whether or not there was any lawful basis for such refusal."

Plaintiff has set forth no additional facts to support her claim that defendants acted in bad faith in denying her insurance coverage. To survive summary judgment, plaintiff must do more than rely on the pleadings. F.R.Civ.P. 56(e) (1998). Plaintiff sets forth no evidence indicating that, while making its initial decision in determining plaintiff's eligibility, Benefit Administrators knew that the information supplied on plaintiff's application was false. Plaintiff appears to assume that such "knowledge" would automatically result from a comparison with plaintiff's earlier application. Plaintiff, however, has set forth no evidence indicating that Benefit Administrators commonly refers to old applications when considering renewed applications for insurance coverage. In fact, plaintiff does not even present independent evidence that Benefit Administrators retains old applications. Because plaintiff has presented no evidence to the contrary, this court must conclude that Benefit Administrators did not *know* plaintiff's weight was incorrectly listed.[21]

At the time of the denial of coverage, therefore, this court assumes that Benefit Administrators was operating under the impression that plaintiff's weight was 210 pounds. While the build chart supplied by the underwriters did not include target categories for a woman four feet, one inch in height, the chart clearly notes that a woman standing four feet, eight inches tall with a weight of 210 would receive an "overweight

---

[21] As an aside, the court notes that Benefit Administrators' assessment of Plaintiff's weight would be incorrect even if it *had* relied on plaintiff's earlier appllication, since that listed her as 125 pounds and she weighed 141 at the time of the denial.

debit" of over 150.   Vanstory's letter of August 22 explains that anything over 150 overweight debit is an automatic decline.

Plaintiff presents no evidence challenging Benefit Administrators' reliance on the guidelines set out in the build chart.  Nor has plaintiff supplied any evidence to rebut the logical presumption that a weight of 210 would disqualify a woman standing four feet, one inch if the same weight would disqualify a woman seven inches taller.   It therefore appears that plaintiff received exactly the coverage to which she was entitled under the terms of the Plan -- to-wit, none.   In <u>Cincinnati Insurance Company v. Little</u>, the Supreme Court of Alabama found the plaintiff precluded from asserting a claim for bad faith refusal to pay insurance benefits where the insurance company had, in fact, paid all benefits to which plaintiff was entitled.   443 So.2d 891, 894 (1983). Though some factual differences exist, this court relies on <u>Cincinnati Insurance</u> to conclude that plaintiff cannot prevail on a claim of bad faith denial where Benefit Administrators had, in fact, provided all coverage to which plaintiff was entitled.   <u>See</u> <u>id.</u>   Defendants' motion for summary judgment on the count of bad faith denial is therefore due to be granted.

**CONCLUSION**

For the foregoing reasons, this court concludes that plaintiff has failed to present a genuine issue of material fact.   Defendants are therefore entitled to summary judgment on all counts.   Summary judgment having been entered on all counts, this court finds no further claims before it in this action.   This court concludes that the action is

19

therefore due to be dismissed.  An appropriate order granting defendants'
motion for summary judgment and dismissing the action will be entered.

DONE this 2 day of October, 1998.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

20